**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF TENNESSEE**
**COLUMBIA DIVISION**

| | | |
|---|---|---|
| **CARLOS LEVY,** | ) | |
| | ) | |
| **Petitioner,** | ) | |
| | ) | |
| | ) | |
| **vs.** | ) | **CASE NO. 1:10-cv-00005** |
| | ) | **JUDGE SHARP/KNOWLES** |
| | ) | |
| **DAVID R. OSBORNE, Warden,** | ) | |
| | ) | |
| **Respondent.** | ) | |

## REPORT AND RECOMMENDATION

### I.  Introduction and Background

This is a habeas corpus action filed pursuant to 28 U.S.C. § 2254.  Judge Sharp

previously referred this matter to the undersigned "for further proceedings under Rule 8(b),

Habeas Corpus Rules, 28 U.S.C. §636(b)(1)(B), and Rule 72.03, Local Rules of Court."  Docket

No. 47.  This matter is before the Court following an Evidentiary Hearing that was held

December 16, 2015.

Petitioner, proceeding pro se, is an inmate at South Central Correctional Facility.  On

January 26, 2010, he filed a pro se Petition for a Writ of Habeas Corpus challenging the legality

of his confinement.  Docket No. 2.

On April 19, 2006, Petitioner pled guilty in the Circuit Court of Marshall County to

aggravated assault, two counts of especially aggravated kidnaping, aggravated robbery, attempted

aggravated robbery, and the unlawful possession of a firearm.  He received an aggregate sentence

of thirty (30) years in prison.

The facts underlying Petitioner's convictions were recounted in the Tennessee Court of Criminal Appeals' Opinion in Petitioner's direct appeal as follows:

> In June 2005, a Marshall County grand jury returned indictments against the Appellant arising from three separate cases. In count one of case number 16716, the Appellant was indicted for the aggravated assault of Rodney Polk, which occurred on April 30, 2005, during a verbal altercation in Marshall County, at which the Appellant "produced a knife and cut Mr. Polk on the left shoulder and back of the head with that knife causing him to go to the emergency room." In case number 16717, the Appellant was indicted for two counts of especially aggravated kidnaping, one count of aggravated robbery, and one count of attempted aggravated robbery involving the victims, Fletcher Watson and John Conger. The factual basis for these crimes established that on the night of May 10, 2005, Watson and Conger were playing in a band at "Ellison Place" in Nashville. The victims were standing near Watson's car during a "band break" when they first encountered the Appellant. The Appellant, brandishing a pistol, ordered the victims into the car and demanded "that he be taken some place." The victims were at times unable to understand the Appellant's demands due to the Appellant's difficulty in speaking English. The twenty-three-year-old Appellant informed the victims that he was a "Mafioso" or gang leader and "that he could do them harm." After entering onto Interstate 65, the victims were ultimately directed to drive to Lewisburg, where the Appellant stated he had relatives. Upon arriving in Lewisburg, the Appellant ordered the two victims out of the car and demanded their money at gunpoint. Approximately $25 was taken from Watson; however, Conger informed the Appellant that he had no money. After searching Conger's pockets, the Appellant walked away. The two victims contacted the police and identified the Appellant from a photo lineup.
>
> On May 14, 2005, police, who were searching for the Appellant as a result of the outstanding warrants, were informed that he was at his girlfriend's residence in Lewisburg. The Appellant was found by the police in the back seat of his girlfriend's car with a loaded handgun. Based upon these facts, the Appellant was indicted in case number 16718 with one count of unlawful possession of a weapon.

Docket No. 17-3, p. 3-4.

On direct appeal, the Tennessee Court of Criminal Appeals affirmed his sentence. The Tennessee Supreme Court later denied Petitioner's application for further review. Docket No. 17-4. Petitioner did not pursue post-conviction relief.

Respondent was directed to file an Answer, plead or otherwise respond to the Petition. Docket No. 6. In the meantime, Petitioner filed an Amended Habeas Corpus Petition, again acting pro se. Docket No. 13. Respondent filed a Motion to Dismiss (Docket No. 15) the Amended Petition as untimely. The Court entered an Order denying the Motion to Dismiss without prejudice to renew it at a later date and appointing the Federal Public Defender to represent Petitioner. Docket No. 21.

Counsel for Petitioner subsequently filed an Amended Habeas Corpus Petition. Docket No. 39. That Petition sets forth two claims for relief. These claims are:

(1) The Petitioner's guilty plea was neither voluntarily nor knowingly given; and

(2) Counsel was ineffective for failing to secure the services of an interpreter for the Petitioner at the plea and sentencing hearings.[1]

Respondent filed an Answer to the Petition. Docket No. 46. Respondent argued that, on direct appeal, Mr. Levy had challenged only the imposition of consecutive sentences in one of his cases. *Id*., p. 4. Respondent argued that Petitioner's claims were both time-barred and procedurally defaulted and that his Petition should be dismissed. Docket No. 46, p. 6. Respondent argued that the Petitioner's state court judgment of conviction "became final" under 28 U.S.C. § 2244(b)(1)(A) on November 11, 2007. *Id*., p. 7. Thus, under the same statute, Petitioner was required to file his Habeas Petition by November 11, 2008. He did not file his Habeas Petition until January 26, 2010, more than 14 months after his conviction became final.

Respondent further noted that Petitioner had failed to allege that he is entitled to equitable

---

[1] At those proceedings, Petitioner was represented by the Office of the Public Defender for Bedford County.

3

tolling, nor did he address his untimely filing. Respondent further argued that Petitioner is not entitled to relief because his claims are procedurally defaulted.

Petitioner subsequently filed a Reply to Respondent's Answer. Docket No. 52. In the Reply, he argued that he is entitled to equitable tolling of the one-year statute of limitations because in 2005, he had "virtually no ability to speak or understand English." Docket No. 52, p. 1. He did not receive any information in Spanish regarding either his appellate rights or state or federal procedure. He did not meet any inmates who spoke both English and Spanish who could advise him about his legal matters during his one-year orientation period at West Tennessee Reception Center. He was transferred to Northwest Correctional Complex, but the prison law library did not have any materials in Spanish. While at Northwest, he met one fellow inmate who was bilingual in Spanish and English and had some knowledge of appellate procedure. That inmate offered to help him file an appeal, but that inmate was transferred to another facility before he was able to do so. During the remainder of his time at Northwest, Petitioner did not meet any other inmates who had the capacity to help him.

In 2009, he was transferred to Morgan County Correctional Complex where he had been continuously housed in the maximum security unit. He did not have direct access to the prison law library, but was provided with a list of materials from which he could select volumes to be delivered to his cell. The list, however, was entirely in English, and all of the legal materials were likewise in English. In 2010, he "finally" met a fellow inmate who was able to help him with legal matters. The inmate drafted a federal habeas petition for him (the initial petition he filed in the instant case) and a civil lawsuit challenging the lack of interpreter services at the Morgan County facility.

Petitioner further argued in the Reply that he "has cause to excuse any procedural default" because the two claims in his Amended Petition were "apparently meritorious," and "default of those claims would be prejudicial." Petitioner cited *North Carolina v. Alford*, 400 U.S. 25, 31 (1970), as "explaining that a defendant who pleads guilty to a charge must do so voluntarily and with knowledge of the consequence of such plea." He further cited *Strickland v. Washington*, 466 U.S. 668 (1984) and *Gonzolaz v. Phillips*, 195 F. Supp 2d 893, 897-903 (E.D. Mich. 2001) for the proposition that counsel's failure to request an interpreter "fell outside the range of professionally competent assistance and either undermined confidence in the outcome or was pro se prejudicial under *United States v. Cronic*, 466 U.S. 648 (1984)."

The undersigned submitted a Report and Recommendation, finding that Petitioner's Habeas Corpus Petition was untimely and recommending that the instant action be dismissed. Docket No. 53. The undersigned concluded that an Evidentiary Hearing was not necessary. The Court concluded that the record showed that Petitioner's Habeas Corpus Petition was not filed until more than fourteen (14) months after the limitation period set forth in 28 U.S.C. § 2244(d)(1)(A) had expired. Moreover, the Court noted, "an inability to speak, write, and/or understand English, in and of itself, does not automatically give a Petitioner reasonable cause for failing to know about the legal requirements for filing his claims." Docket No. 53, p. 6, *citing Cobas v. Burgess*, 306 F.3d 441, 444 (6th Cir. 2002). In addressing the equitable tolling issue, the undersigned stated:

> Neither the trial judge nor counsel for the Petitioner felt the need to obtain the services of an interpreter for him at the plea and sentencing hearings. The trial judge was able to converse with the Petitioner during the hearings, although admittedly it was difficult at times. The Petitioner acknowledges that, shortly after his entry

> into the prison system, he "met a fellow inmate who was bilingual in Spanish and English and had some knowledge of appellate procedure."

Docket No. 53, p. 6-7.

The undersigned also noted that Petitioner had been in this country at least three years before the limitation period expired. From the foregoing circumstances, it did not appear that the Petitioner was unable to exercise his right of access to the courts with a little effort on his part. The undersigned concluded that Petitioner had failed to make a showing that he pursued his rights in a diligent manner or that extraordinary circumstances prevented him from filing a timely Petition. Thus, the undersigned recommended that the Amended Habeas Corpus Petition should be denied and that the instant action should be dismissed. Docket No. 53, p. 7. In view of this recommendation, the undersigned did not specifically address the procedural default issue.

Petitioner filed objections to the Report and Recommendation. Docket No. 54. Judge Sharp subsequently entered a Memorandum (Docket No. 55) and an Order (Docket No. 56) rejecting the Report and Recommendation. Judge Sharp concluded that "this matter should be returned to the Magistrate Judge to receive evidence and/or hold an Evidentiary Hearing on the question of whether the statute of limitations should be equitably tolled." Docket No. 55, p. 1. Judge Sharp noted that the undersigned had ruled based solely on the State Court record and the pleadings that had been filed in the instant action. Judge Sharp further stated that the Court "does not believe that those materials adequately answer the question of whether Petitioner's alleged lack of proficiency in the English language constituted extraordinary circumstance so as to serve as a real impediment to the timely filing of his Habeas Petition." *Id.*, p. 5. Judge Sharp further stated:

> While the Magistrate Judge concluded that neither the trial judge
> nor defense counsel felt the need to obtain the services of an
> interpreter, the record does not show whether that was ever actually
> considered, even though, as the Magistrate Judge observed, the
> trial judge had some difficulty communicating with Petitioner.
> Further, while Petitioner indicated (as the Magistrate Judge stated)
> that he met a fellow inmate who was bilingual and had some
> knowledge of appellate procedure, Petitioner also claimed that (1)
> the inmate was transferred to another institution before he could be
> of assistance, (2) Petitioner was then transferred to another facility
> where he lacked direct access to a law library and the only material
> he could get was in English, and (3) it was not until some time in
> 2010 that he met a fellow inmate who was able to help him with
> legal matters. Finally, while Petitioner may have been in the
> United States for three years before the statute ran, this does not
> really say anything about whether he has the ability to
> meaningfully communicate in English.

*Id.*, p. 5-6.

Thus, Judge Sharp rejected the Report and Recommendation and returned this matter to

the undersigned "for the development of an evidentiary record and a recommended disposition

based upon that record." *Id.*, p. 7.

The undersigned subsequently set an Evidentiary Hearing, which was continued multiple

times. Docket Nos. 62, 65, 67, 70, 83, 95, 98. Before that Hearing actually occurred,

Respondent filed a "Motion to Dismiss Procedurally Defaulted Claims in Amended Habeas

Corpus Petition." Docket No. 90. Respondent argued that the only claims raised in Petitioner's

Amended Petition, those of an involuntary guilty plea and ineffective assistance of counsel, had

not been properly exhausted in state court. Respondent further argued that the claims were

procedurally defaulted, and that Petitioner's alleged "unfamiliarity with the English language is

insufficient to establish cause to excuse his procedural default because such alleged unfamiliarity

is not 'external to [his] defense.'" Docket No. 90, p. 1, *citing Bonilla v. Hurley*, 370 F.3d 494,

498 (6th Cir. 2004).

Petitioner filed a Response in opposition to the Motion to Dismiss, arguing that he planned to introduce evidence at the Evidentiary Hearing that would provide grounds not only to equitably toll the statute of limitations, but also to excuse his procedural default. Alternatively, he argued that "even on the existing record, [his] lack of post-conviction counsel provide[ed] grounds to excuse his procedural default of his federal habeas claims." Docket No. 96, p. 3.

The undersigned subsequently entered an Order concluding that "an Evidentiary Hearing was required both to resolve the question of whether the statute of limitations should be equitably tolled and to address the issue of procedural default." Docket No. 97. The Court, therefore, denied the Motion to Dismiss without prejudice. *Id*.

## II. Testimony at the Evidentiary Hearing

The Court subsequently held the Evidentiary Hearing on December 16, 2015.[2]

Petitioner testified at the Hearing, with the assistance of an interpreter. Even so, he was evasive during questioning by his own counsel. He was asked how well he spoke English when he arrived in Lewisburg, and he responded, "I have always known Spanish." Tr. 58. His lawyer asked what language he spoke at a prior job in Lewisburg, and Petitioner responded, "[T]here was another worker there who spoke Spanish." Tr. 58. When his counsel asked if he tried to find other inmates to help him with his case, he responded, "I didn't know that I could appeal. I had no understanding that I could appeal." Tr. 63.

Petitioner also contradicted himself on a number of important matters. He gave the

---

[2] The evidentiary hearing transcript has been filed as Docket No. 110. The hearing transcript will be referred to as "Tr.," followed by the appropriate page number.

following testimony:

> Q.  And at your guilty plea hearing in Marshall County, you admitted to the State's version of events underlying your convictions; correct?

> A.  I accepted it because they sent me back.  I wasn't accepting it when they were sentencing me because I didn't understand.

> Q.  But you had already entered your guilty plea at the time you were sentenced; correct?

> A.  Yes.

> Q.  And it was at this plea hearing where you admitted the State's versions of events underlying your conviction; correct?

> A.  I didn't understand.

> Q.  Can you say the answer again.

> A.  I didn't understand what you said.

> Q.  At the guilty plea hearing before your sentencing, you agreed to the State's version of events underlying your convictions?

> A.  No, no.

Docket No. 110, p. 69-70.

When he was confronted with the Transcript of the plea hearing, however, in which he was asked if the rather lengthy description of what the State said happened in these cases actually happened, he responded yes, and he stated that that was a truthful admission under oath. Tr. 70-71.

Petitioner repeatedly claimed that he had no understanding of the plea proceedings.  Tr. 74, 84.  He acknowledged later, however, that he understood his right to plead not guilty and proceed to trial.  Tr. 86.  He testified that he truthfully told the trial court that he understood the

potential punishment for his charges.  Tr. 86-87.  He then changed his testimony again:

> Q.  So you didn't understand anything about your plea agreement when you entered that plea?
>
> A. No, I didn't understand.
>
> . . .
>
> Q.  Again, back to the 27-2 document [the Transcript of the Plea Acceptance Hearing], I refer you to page 13, line 22, specifically.  The Court asked with regard to your plea petitions: Is there anything in those petitions that you did not understand?
>
> Your response: I understand everything.
>
> Is that a truthful response?
>
> A. No, because if you look at page 34, where it says – it said that I don't understand anything.

Tr. p. 74, 84.

> He later testified that he understood his right to plead not guilty and proceed to trial:
>
> Q.  You also told the Judge that you understood your right to plead not guilty and go to trial.  Is that correct?
>
> A.  I believe so.
>
> Q.  And was that a truthful statement?
>
> A.  I think so.
>
> Q.  So you were able to understand certain legal aspects about your plea but not others; is that correct?
>
> A.  Yes.
>
> Q.  Even though you didn't have a Spanish interpreter?
>
> A.  Yes.

Tr. 86.

He further testified that he truthfully told the trial court that he understood the potential punishment for his charges.  Tr. 86-87.

Petitioner gave the following contradictory testimony regarding whether his lawyer had read the plea Petition to him:

Q.  Did your attorney read it to you in English?

A.  Well, he read it in English.  I didn't understand English.

· · ·

Q.  And why did you sign that document if you didn't understand it?

A.  It's my lawyer.  I have to trust in my lawyer.

Tr. 80.

Paragraph 7 of the plea Petition, which is signed by Petitioner, reads in part: "My attorney has explained that the Court will consider each count of each indictment or information to which I plead guilty as a separate offense and may order that I serve the sentences for multiple offenses consecutively, that is, one after the other."  Docket No. 27-1, p. 87.  When Petitioner was confronted with this language, he testified:

A.  If that were the case, I would not have pled guilty.

Q.  But you admit that your attorney read that to you in English?

A.  I know that this document – that it couldn't have been that he read it to me, because if I had known this, that the sentences were going to be multiple, one after the other, then I wouldn't have pled.

Q.  Was it that your attorney didn't read it to you? Or that he read it or she read it and you didn't understand it?  Which is it?

A.  *I never saw this document.  Never.*

Q.  You never saw that document, but you signed it?

A. Yeah, I know it's my sign, but – well that's my sign, *yes, I signed it.* But if I had known that there were going to be a sentence, there were going to be these multiple sentences, then I would not have accepted it. I wouldn't have accepted it.

Tr. 81 (emphasis added).

During his plea hearing, he told the trial court that he finished high school. Docket No. 27-2, p. 7. He told an investigator from Habeas Counsel's Office that he dropped out of school in the 9th grade. Docket No. 154-1, p. 3. At the Evidentiary Hearing, however, he testified that he completed school through either the 2nd or 5th grade. Tr. 57.

He testified that he had responded untruthfully to several questions posed by the trial court during the plea proceedings. For example, he testified:

Q. Yes, sir. If you would look please at Line 10 [of Docket No. 27-2, p. 43]. The Court asked you: Do you have any complaints about the way and manner in which the Public Defender's office has represented you? And your response was: No, sir. Is that correct?

A. What does that mean? I didn't understand. Another time, please?

Q. Sure. On Line 10 the Court asked you: Do you have any complaints about the way and manner in which the Public Defender's office has represented you? Answer: Your response was No, sir.

A. Yes.

Q. Was that a truthful response?

A. No.

. . .

Q. So why did you respond to that question – again, on Line 10, why did you respond no instead of yes?

A. Because I didn't understand. I didn't understand.

Q. So you just picked yes or no randomly?

A.  Yes, and that's the reason why they took me out of Court that day for me to talk to my attorney, because I didn't understand.

Q.  And Line 13, the Court asked: Have you had any difficulty communicating with them about your case? And your response was: No, sir.  Correct?

The Interpreter: May the Interpreter ask for a repetition of the answer, please?

Mr. Spangler: The answer was: No, sir.

The Witness: I believe so.

By Mr. Spangler:

Q.  And was that a truthful response?

A.  No, the attorney never – I didn't understand her so –

Q.  Again you just randomly selected yes or no as your response?

A.  Yes.

Q.  Going to Line 16, the Court asked: Have you been able to talk with them all that you want in order to decide to plead guilty?  Your response: Yes, sir.

A.  Yes.

Q.  Truthful response?

A.  No.

Q.  Again, randomly selecting yes or no as your response?

A.  Yes.

Q.  And again, just to reiterate, you never asked your attorney for a court interpreter in this case?

A.  No, no, I didn't understand.  I didn't want the Interpreter if I didn't understand.

Q.  Did you and your attorney review a written plea agreement that you signed?

A.  As far as I recall, no.

Tr. 77-79.

Donna Hargrove was counsel for Petitioner when he was charged with the underlying crimes, and she testified at the Evidentiary Hearing. She was and is the 17th District Public Defender, covering Bedford, Lincoln, Moore, and Marshall Counties. She has represented thousands of criminal defendants since obtaining her law license in 1990. Tr. 96-97. She stated that it is "very common" for her to represent clients whose first language is not English. Tr. 97. She frequently uses interpreters with such clients. Tr. 97. She noted that it is "fairly easy" to tell if an interpreter is necessary, because "you are not able to carry on a conversation with [the client]." Tr. 98. She could not recall any situation where a client of hers requested an interpreter but one was not provided. Tr. 99.

She was able to communicate with the Petitioner in English. Tr. 100. Any deficiencies in his English language abilities did not prevent him from understanding their discussions. Tr. 100. Petitioner was able to respond to questions and ask questions in English. *Id.* She did not feel the need for an interpreter during her representation of Petitioner. *Id.* Petitioner never asked her about an interpreter. Tr. 101. He was able to give more than yes/no responses and could communicate in full sentences. Tr. 101.

She discussed the facts of his case with him and discussed his version of those facts. Tr. 101-02. They discussed the State's evidence and possible defenses. Tr. 102. She reviewed the Petitioner's plea Petition with him. Tr. 104. She discussed the possibility of consecutive sentencing with Petitioner. Tr. 105-07. Petitioner initially rejected the State's plea offer of 40 years, but decided to enter an open plea because he "did not want to go to trial." Tr. 106-07.

Ms. Hargrove explained to him that an open plea meant that there was no agreement as to

14

sentencing and that the sentence would be determined by the Judge later.  Tr. 106-07.  She

further testified:

> Q.  And did you explain that an open plea meant essentially that there was no
> agreement as to sentencing, and that that would be determined later on?
>
> A.  Yes, that the Judge would determine range of punishment.  The Judge would
> determine number of years, whether it was consecutive or concurrent, and whether
> he was going to get any type of alternative sentencing.
>
> Q.  And in advising him before the plea, did you discuss sort of the realm of
> possibilities of sentencing?
>
> A.  Yes.
>
> Q.  Which included the possibility of consecutive sentencing?
>
> A.  Absolutely.
>
> Q.  And do you recall specifically that the Judge reiterated that fact during the plea
> hearing, that it was an open plea, and that there was no agreement as to
> sentencing?
>
> A.  I believe he did; yes, sir.
>
> Q.  Did you coach Mr. Levy to enter these pleas, or did he make that decision on
> his own?  That's a vague term.  In your assessment, was it Mr. Levy's decision to
> plead guilty?
>
> A.  Yes, it was Mr. Levy's decision.  We certainly give legal advice, we give our
> opinions as to the legal matters, but it is always whatever the client wishes that
> prevails.

Tr. 106-07.

> Ms. Hargrove further stated under oath:
>
> Q.  I just wanting [*sic*] to go back to this plea agreement real quick.  After you
> either read that or had Mr. Levy read that, whichever, either way it was, did you
> ask him if he understood that?
>
> A.  My normal – again, ten years ago.  I can't tell you exactly what.  But my

normal procedure is, if they have read it or whether I've read it, is to ask them is there anything in there that they did not understand. And if I'm reading it to them, I tell them at any time stop me if you don't understand what I'm saying. But I'm saying, if there is anything there you don't understand, please let me know and I will discuss it with you.

Q. Do you remember if Mr. Levy confirmed that he understood all the terms of that plea agreement?

A. Yes, sir. Now, whether – whether he had questions, I do not remember. But in the end –

Q. They were resolved to his satisfaction if he had questions?

A. Yes, sir.

Q. Do you remember either you or any attorney in your office saying anything to Mr. Levy guaranteeing him concurrent sentencing in this case?

A. Absolutely not.

Q. Generally would you have let Mr. Levy plead guilty if you felt he didn't understand your discussions leading up to this plea?

A. No, sir.

Q. Would you have let Mr. Levy plead guilty if you thought he didn't understand the range of definite and potential consequences to his plea?

A. No, sir.

Q. Did he request a Spanish interpreter at any time?

A. No, sir.

Tr. 108-09.

Ms. Hargrove also testified on cross-examination:

Q. And from the discovery, you were also aware that the two victims in the kidnaping both said that Mr. Levy was very difficult to understand?

A. I did, but I also knew from the discovery that they gave a very detailed

description of what Mr. Levy told them, everything they had, so it wasn't that they could not understand what he was saying and he couldn't understand what they were saying. It was just I took it he was difficult to understand partly because of his heavy accent, and I guess you could say he wasn't as fluent as most people.

Tr. 114-15.

Ms. Hargrove testified that Mr. Levy never asked for an interpreter "at any time."[3]

Tr. 109.

Petitioner presented the testimony of three other witnesses at the Evidentiary Hearing. All three were prisoners who had been incarcerated with the Petitioner at times between 2006 and approximately 2010.

Reynaldo Sanchez testified that he is bilingual in Spanish and English, and, before his incarceration, he lived in Lewisburg, Tennessee. Tr. 6. He met Petitioner in 2006 while at the Marshall County Jail on charges of aggravated assault, aggravated burglarly, and aggravated robbery. Tr. 7. He was ultimately convicted of those offenses. *Id*. Sanchez and Petitioner asked to be "cellies," and they lived together between two and four months. Tr. 8. Sanchez testified that he and Petitioner communicated only in Spanish because Petitioner did not understand English. Tr. 8. Sanchez testified that there were 6 inmates at the Marshall County Jail who spoke Spanish, but they were in other cells. Tr. 8-9. Petitioner occasionally asked him and other inmates for assistance to obtain "forms." Tr. 9. He testified that Petitioner did not understand his own Court proceedings. Tr. 10.

Mr. Sanchez later saw Petitioner at Northwest Correctional Center. Tr. 10. That was around the end of 2006 or 2007. Tr. 11. He talked with Petitioner only once or twice while he

---

[3] Mr. Levy admitted that he did not request an interpreter. Tr. 75-76, 79.

was at Northwest. *Id.* Petitioner told him once that he "had got too much time, and he didn't understand what he signed for." Tr. 12.

There were no legal materials available at Northwest in Spanish. The only Spanish materials at the library at Northwest were "novels." Tr. 13. There were no inmate legal advisors who spoke Spanish at Northwest. Tr. 13. There were, however, "a lot of Spanish speakers" at Northwest. Tr. 15. He does not know whether Petitioner attempted to communicate with any of them to get legal assistance. Tr. 15. The other Spanish speakers at Northwest were not in the unit where Petitioner was incarcerated. Tr. 18.

While Mr. Sanchez was at Northwest, he was able to mail letters to friends and family and to the "Court system." Tr. 16. He presumes Mr. Levy would have been able to do the same. Tr. 16.

On cross-examination, Mr. Sanchez said that he never saw Petitioner speak to any other inmates in English, either at Marshall County or at Northwest. He never saw Petitioner ask for an interpreter, nor did Petitioner ever ask him about getting an interpreter. Tr. 15. He was at Northwest together with Petitioner for "like three or four months." Tr. 15.

Petitioner next called Angel Delgado. Mr. Delgado is bilingual in Spanish and English. Tr. 21. Between August 2008 and February 2010, he and Petitioner were housed together at the Morgan County Correctional Facility. Tr. 22-24. Mr. Delgado testified that he and Petitioner communicated in Spanish because Petitioner did not understand English. Tr. 25. He never heard Petitioner communicate in English. Tr. 25. Petitioner tried to communicate with the prison staff to get assistance with translation. Tr. 25-26. Petitioner sought assistance from him for "small things," but the only legal advice he ever offered Petitioner was to "put in an inmate request

18

[form]" for legal materials or assistance.  Tr. 26-27.  He and Petitioner did not talk about the details of Petitioner's case.  Tr. 26.  He testified that "[everybody was trying to go to Court, trying to get sentence reduced," but that Petitioner did not ask him for "help trying to find someone to help him go back to court."  Tr. 26-28.

Mr. Delgado testified that he has four prior felony convictions.  Tr. 30-31.  He never heard Petitioner speak a single word in English.  Tr. 32.  Petitioner would communicate with prison staff using sign language.  Tr. 32.  Mr. Delgado sometimes communicated with prison staff for the Petitioner, but Petitioner never asked him for help in obtaining an interpreter.  Tr. 32.

Mr. Delgado was able to mail letters to friends and family, as well as to the state or federal courts, during his time in the maximum security unit with Petitioner.  If Petitioner needed anything, he would ask Mr. Delgado, who would "provide it for him."  Tr. 33.  Mr. Delgado was unaware of whether Petitioner ever sought legal or interpretative assistance from other inmates.  Tr. 33.  He further testified that in maximum security, prisoners received a rule book and "the address of the courthouse . . . ."  Tr. 34.  He also confirmed that legal advice was available upon "request to the library."  Tr. 34.  Additionally, Petitioner had friends or family in Puerto Rico who could have assisted him in finding addresses and the like.  Tr. 35-36.

Petitioner's third witness was Mike Settle.  Mr. Settle met Petitioner at the Morgan County Correctional Facility.  Tr. 37.  He has been in TDOC custody for 19 years.  Tr. 37.  He is serving time for "many robberies," escape and assault.  Tr. 47.  He admitted to having at least 12 prior felonies.  Tr. 47-48.  He had no knowledge of any previous efforts about the Petitioner to pursue any legal remedies.  Tr. 53.  He does not speak Spanish.  Tr. 37.  There were no legal materials available at Morgan County for Spanish speakers.  Tr. 38.  Mr. Settle has "developed

some knowledge about the law."  Tr. 39.  He has filed lawsuits for himself and for other inmates.
Tr. 39.

Mr. Settle learned through another Spanish speaking inmate that Petitioner was seeking
legal assistance.  Tr. 40-41.  He was unable to communicate with Petitioner directly because
Petitioner did not speak English.  Tr. 41.  He began receiving information about Petitioner's case
through another inmate, and he began assisting Petitioner with his case and legal paperwork.  Tr.
42-43.

Mr. Settle prepared the federal habeas action for the Petitioner (the instant case) and
provided instructions about how to mail it to the Court.  Tr. 43.  He filed a grievance for
Petitioner concerning the lack of resources for Spanish speakers at the prison and he also helped
Petitioner file a civil lawsuit in Federal Court concerning the lack of available Spanish
interpreters at Morgan County.  Tr. 44-45.

### III.  Analysis

As Judge Sharp has previously noted, the Sixth Circuit in *Cobas v. Burgess,* 306 F.3d
441, 444 (6th Cir. 2002), held that "where a petitioner's alleged lack of proficiency in English has
not prevented the petitioner from accessing the courts, that lack of proficiency is insufficient to
justify an equitable tolling of the statute of limitations."  The *Cobas* Court also stated, "An ability
to speak, write, and/or understand English, in and of itself, does not automatically give a
petitioner reasonable cause for failing to know about the legal requirements for filing his claims."
*Id.*

Petitioner bears the burden of showing that he is entitled to equitable tolling.  *Allen v.
Yukins*, 366 F.3d 396, 401 (6th Cir. 2004).  The Sixth Circuit has repeatedly stated that equitable

tolling should be applied "sparingly." *Solomon v. United States,* 467 F.3d 928, 933 (6th Cir. 2006). A Petitioner must establish two elements in order to equitably toll the habeas statute of limitations: "(1) that he has been pursuing his rights diligently, and (2) that some extraordinary circumstance stood in his way." *Holland v. Florida*, 560 U.S. 631, 649 (2010) (citation omitted).

The Sixth Circuit has also stated:

> Typically, equitable tolling applies only when a litigant's failure to meet a legally-mandated deadline unavoidably arose from circumstances beyond that litigant's control . . . . absent compelling equitable considerations, a court should not extend limitations by even a single day.

*Graham-Humphreys v. Memphis Brooks Musuem, Inc.,* 209 F.3d 552, 560-61 (6th Cir. 2000).

The Court had the opportunity to closely observe the witnesses who testified at the Evidentiary Hearing. Mr. Levy simply was not credible, but Ms. Hargrove was.[4] At the Evidentiary Hearing, Mr. Levy was significantly impeached by counsel for Respondent, as discussed above. The Court does not credit Mr. Levy's testimony that he did not speak English well enough to understand what was happening at the plea hearing. The Court finds that Mr. Levy understood the situation at the plea hearing and his rights. He voluntarily and knowingly pled guilty to the charges pursuant to an open plea agreement. Ms. Hargrove's testimony that Petitioner never asked for an interpreter at the plea hearing is uncontradicted. He is not entitled to equitable tolling of the statute of limitations.

Furthermore, based upon the facts found by the undersigned, trial counsel could not possibly have been ineffective by failing to secure an interpreter either at the plea hearing or prior

---

[4] The testimony of Petitioner's three other witnesses, even if fully credited, does little, if anything, to help Petitioner.

thereto.

In view of the foregoing, it is unnecessary for the Court to address the procedural default issues.

For the foregoing reasons, the undersigned recommends that Petitioner's Habeas Corpus Petition should be DENIED, and that this action should be DISMISSED WITH PREJUDICE.

Under Rule 72(b) of the Federal Rules of Civil Procedure, any party has fourteen (14) days after service of this Report and Recommendation in which to file any written objections to this Recommendation with the District Court. Any party opposing said objections shall have fourteen (14) days after service of any objections filed to this Report in which to file any response to said objections. Failure to file specific objections within fourteen (14) days of service of this Report and Recommendation can constitute a waiver of further appeal of this Recommendation. *See Thomas v. Arn,* 474 U.S. 140, 106 S.Ct. 466, 88 L. Ed. 2d 435 (1985), *reh'g denied*, 474 U.S. 1111 (1986); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72.

_____
E. Clifton Knowles
United States Magistrate Judge