IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
COLUMBIA DIVISION

| | |
|---|---|
| CARLOS LEVY, ) | |
| ) | |
| Petitioner, ) | |
| ) | No. 1:10-cv-00005 |
| v. ) | |
| ) | Chief Judge Sharp |
| DAVID R. OSBORNE, Warden, ) | |
| ) | |
| Respondent. ) | |

**MEMORANDUM**

Pending before the Court are the Report and Recommendation of the Magistrate Judge (R&R) (Docket No. 116) and Petitioner's objections to the R&R. (Docket No. 119.) Pursuant to Rule 72(b) of the Federal Rules of Civil Procedure, this Court is required to "determine de novo any part of the magistrate judge's disposition that has been properly objected to," and "may accept, reject, or modify the recommended disposition, receive further evidence, or return the matter to the magistrate judge with instructions." Fed. R. Civ. P. 72(b)(3). Having reviewed the R&R, Petitioner's objections and the file, including the transcript of the evidentiary hearing conducted by the Magistrate Judge and the parties' post-hearing briefs (Docket Nos. 110, 114, 115), the Court agrees with the Magistrate Judge that Petitioner is not entitled to equitable tolling of the statute of limitations and that his petition is therefore untimely.

I. BACKGROUND AND PROCEDURAL HISTORY

The context relevant to the issue before the Court are that Petitioner pleaded guilty without a plea agreement to several criminal offenses on April 19, 2006, and was sentenced to an effective 30 year prison sentence on June 7, 2006. (Docket No. 2, at 12.) Through counsel, Petitioner appealed the sentence, and the Tennessee Court of Criminal Appeals affirmed on April 4, 2007. (Docket No. 2, at 11.) After counsel moved to withdraw from further representation (Docket No. 2, at 14), Petitioner filed a *pro se* application for permission to

appeal to the Tennessee Supreme Court on June 5, 2007 (http://www2.tncourts.gov/PublicCaseHistory/CaseDetails.aspx?id=24014&Party=True),[1] which was denied on August 13, 2007. (Docket No. 2, at 18.) His conviction was thus final on Monday, November 12, 2007 (the first business day following his 90-day window to petition the United States Supreme Court for certiorari under Supreme Court Rule 13.1; *see Jimenez v. Quarterman*, 555 U.S. 113, 119–20 (2009) (holding that state convictions are final under § 2244(d)(1)(A) when Supreme Court certiorari is exhausted or when the time for filing a certiorari petition expires)).

Petitioner's next action to challenge his convictions or sentences was the submission of his original *pro se* petition in this case, which is deemed filed on January 25, 2010, the date that he certified that he was mailing it to the district court.[2] (Docket No. 2, at 9.) That petition asserted 3 claims: (1) Petitioner's convictions and sentences were void because the trial court did not have jurisdiction over the charges arising from another county; (2) duplicative charges and consecutive sentences violated Petitioner's right to due process because the charges arose from a single course of conduct; and (3) trial counsel was ineffective for failing to arrange for an interpreter for the Spanish-speaking Petitioner in connection with his plea, and Petitioner was prejudiced because he would not have pleaded guilty if he had understood that he would receive consecutive sentences. With the Court's permission, Petitioner filed an amended *pro se* petition on March 15, 2016, which withdrew his admittedly unexhausted ineffective-assistance claim. (Docket Nos. 12, 13.) Respondent filed a motion to dismiss as untimely (Docket No. 15), to which Petitioner responded in opposition. (Docket No. 26.) In the interim, however, the Court

---

[1] Neither party has offered Petitioner's 2006 application into evidence before this Court. However, federal courts may take judicial notice of state court records available to the public online, *Lynch v. Leis*, 382 F.3d 642, 648 n.5 (6th Cir. 2004), and the state court's notation that the application was filed *pro se* has some significance to the issues being litigated.

[2] Petitioner originally submitted his petition to the United States District Court for the Eastern District of Tennessee, which transferred the case to this Court for proper venue on January 28, 2010. (Docket No. 4.)

appointed counsel to represent Petitioner and file an amended complaint, and denied Respondent's motion without prejudice. (Docket No. 21.) Through counsel, Petitioner filed a third petition on February 17, 2011. (Docket No. 39.) This petition reasserted the ineffective-assistance claim from the original *pro se* petition, and added an independent claim that Petitioner's plea was not knowing and voluntary because he did not understand what was said at the plea hearing. (*Id.*) Despite being styled as an "Amended Petition," the petition asserted that it did not "abrogate" any of the claims asserted in Petitioner's *pro se* filings, but merely "supplement[ed]" them.[3] (*Id.* at 3–4.) On July 18, 2011, Respondent filed an answer asserting the defenses of statute of limitations and the doctrine of procedural default, without addressing the merits of Petitioner's claims. (Docket No. 46.) In his reply filed November 7, 2011, Petitioner asserted that he is entitled to equitable tolling of the statute of limitations and has cause to overcome procedural default, because he is not able to communicate in English and had not had access in prison to legal materials in Spanish or bilingual legal assistance. (Docket No. 52.) The case was referred to the Magistrate Judge on July 28, 2011. (Docket No. 47.)

On May 9, 2013, the Magistrate Judge entered an R&R finding no basis for tolling and recommending that the petition be dismissed as time-barred. (Docket No. 53.) Following Petitioner's objection, on July 26, 2013, the Court rejected the R&R and returned the case to the Magistrate Judge for further development of the evidence pertaining to Petitioner's equitable tolling issue. (Docket No. 55.) The Magistrate Judge held an evidentiary hearing on December 16, 2015. (Docket No. 110.)

On May 3, 2016, the Magistrate Judge entered a second R&R, in which he found that Petitioner was not a credible witness and that his testimony was "significantly impeached" on

---

[3] This practice is not favored by the Court. Supplemental pleadings filed by appointed counsel, which neither develop nor withdraw earlier *pro se* claims and do not relieve the Court or other parties of the challenge of addressing *pro se* filings, *see Braden v. U.S.*, 817 F.3d 926, 930–31 (6th Cir. 2016) (finding district court erred in failing to consider original pro se petition after supplemental petition was filed by counsel), defeat much of the purpose of appointing counsel.

cross-examination and credibly refuted by the testimony of his trial counsel. (Docket No. 116, at 21.) He concluded that Petitioner is not entitled to equitable tolling and, moreover, that his ineffective-assistance claim fails on the merits:

> The Court does not credit Mr. Levy's testimony that he did not speak English well enough to understand what was happening at the plea hearing. The Court finds that Mr. Levy understood the situation at the plea hearing and his rights. He voluntarily and knowingly pled guilty to the charges pursuant to an open plea agreement. Ms. Hargrove's testimony that Petitioner never asked for an interpreter at the plea hearing is uncontradicted. He is not entitled to equitable tolling of the statute of limitations.
>
> Furthermore, based upon the facts found by the undersigned, trial counsel could not possibly have been ineffective by failing to secure an interpreter either at the plea hearing or prior thereto.

(*Id.* at 21–22.) He therefore recommended that the petition be denied and this action be dismissed with prejudice. (*Id.* at 22.)

After obtaining an extension of time, Petitioner filed his objections to the R&R on June 16, 2016. (Docket Nos. 118, 119.)

## II. EVIDENTIARY HEARING

Because timing is necessarily significant to the statute of limitations and equitable tolling issues in this case, the Court prefaces the rest of the evidence adduced at the hearing with the following timeline established by Petitioner's own testimony: Petitioner was transferred to Northwest Correctional Complex ("Northwest") in July 2006 (while his direct appeal was still pending), and remained there until August 2009. (Docket No. 110, at 63.) From August 2009 until November 2011, he was housed in the Morgan County Correctional Complex ("Morgan County"). (*Id.* at 66.)

Reynaldo Sanchez, a bilingual inmate who had contact with Petitioner in the Marshall County Jail and later in Northwest, testified that when they were in the Marshall County Jail together, he only communicated with Petitioner in Spanish, because Petitioner did not understand any English words except for curse words. (Docket No. 110, at 8.) Sanchez would

4

help Petitioner in jail by translating for him with guards and helping him fill out request forms. (*Id.* at 9.) They never discussed how the criminal justice system worked, but when Petitioner came back from court appearances, he would tell Sanchez that he did not know what had happened. (*Id.* at 10.) Petitioner was moved out of the jail before Sanchez, but the two met again sometime later in Northwest, where they only spoke once or twice. (*Id.* at 11.) Petitioner told Sanchez "that he had got too much time, and he didn't understand what he signed for," and Sanchez told him "you've got to try to go back." (*Id.* at 12.) Sanchez had no knowledge of legal procedures, and said that the prison did not have legal materials in Spanish or Spanish-speaking legal advisors or library staff. (*Id.* at 12–14.) Sanchez testified that he never heard Petitioner speak any English at all, but that Petitioner never asked him about getting an interpreter or, to his knowledge, asked staff for one. (*Id.* at 14, 15.) He testified that there were "a lot of Spanish speakers" at Northwest, but he did not know if Petitioner tried to communicate with any of them about legal assistance, because he and Petitioner were in different units. (*Id.* at 15.) There were also two correctional officers who worked the visiting area at Northwest who spoke Spanish. (*Id.* at 16, 18.) Sanchez testified that for some period of time at Northwest, Petitioner was "in the suicide tank" and had "no access to nothing," and that he thought Petitioner was otherwise on close custody, which limited him to submitting written requests for library materials rather than visiting the library. (*Id.* at 17–18.) The prison did not provide court addresses to inmates. (*Id.* at 19.)

Petitioner's next witness was Angel Delgado, a bilingual former inmate who spent some amount of time housed with Petitioner in the same maximum security pod in Morgan County. (Docket No. 110, at 21–22.) He testified that inmates in maximum security were locked in their cells 23 hours a day, but managed to communicate with each other through doors and vents and by sending notes and letters. (*Id.* at 24.) Delgado and Petitioner always spoke to each other in Spanish, because he does not recall that Petitioner knew any English words. (*Id.* at 25.)

5

Petitioner sometimes attempted to communicate with prison staff with hand signals, and sometimes asked Delgado to translate for him. (*Id.* at 26.) Delgado did not know anything about the law, and "as far as legal work, I just always told him, just try to put in an inmate request," because maximum security inmates are not allowed to go to the library but could request books or to talk to an inmate advisor. (*Id.* at 26–27.) He did not think that inmate advisors had any specialized legal training. (*Id.* at 28.) Delgado did not recall there being any Spanish speakers in the prison library, and did not know whether there were any Spanish legal materials there. (*Id.* at 28–29.) Delgado testified that "[e]verybody was trying to go to court, trying to get sentence reduced, whatever," but he and Petitioner did not talk about the details of Petitioner's case. (*Id.* at 26.) He did not recall Petitioner's ever asking him to help find someone to assist with his legal case. (*Id.* at 28.) There were no materials posted in their unit explaining how to go to court or to get advice about going to court, in either English or Spanish. (*Id.* at 29.) Delgado testified that there were only three Spanish-speaking inmates in the pod. (*Id.*) He did not know whether Petitioner had ever asked staff for an interpreter or asked any other inmates for legal assistance. (*Id.* at 32–33.) Delgado testified that when inmates arrived in maximum security they received a rule book, which he thought contained "the address of the courthouse," but he was not sure what courthouse. (*Id.* at 34.) They did not receive anything containing legal advice about how to go to federal court, but they could submit an inmate request to the library for legal advice "and they will come back and speak to you," and provide information about what legal resources were available. (*Id.* at 34–35.)

Mike Settle, an inmate who does not speak any Spanish, testified that he was housed in Morgan County in the same unit as Petitioner from 2009 to 2010. (Docket No. 110, at 37.) Settle testified that it was hard to get library materials at that time, that it would take a week for requests to be answered and that nobody was coming to assist them – "Especially if you speak Spanish, there wasn't nobody." (*Id.* at 38.) During the time Petitioner was there, there was no

6

inmate legal advisor who would come give maximum security inmates legal advice, and there was nothing posted on the unit walls or otherwise provided to inmates to explain federal court procedures or habeas corpus law, in English or Spanish. (*Id.* at 39–40.) Settle testified that he personally has developed some knowledge of the law in prison, and that he has filed lawsuits himself and has assisted other inmates preparing and filing lawsuits. (*Id.* at 39.) A bilingual inmate informed Settle about Petitioner's desire to go back to court, but Settle and Petitioner were unable to communicate directly because Petitioner could not speak any English beyond words like "hi, yes or no." (*Id.* at 40–41). Communicating through the other inmate, Settle agreed to assist Petitioner and had Petitioner pass his legal paperwork to him. (*Id.* at 42–43.) Settle reviewed the paperwork, conducted some research and drafted a petition for Petitioner as quickly as he could. (*Id.* at 43.) Settle wrote the petition, copied it, put it in an envelope with Petitioner's name on it, and had the bilingual inmate tell Petitioner to mail it to the clerk. (*Id.* at 43.) After the habeas petition was filed, Settle drafted a grievance for Petitioner about the lack of Spanish-speaking assistance, but he did not recall being told "how long these interpreter issues had been a problem" for Petitioner. (*Id.* at 44–45.) Settle also drafted a federal civil complaint for Petitioner about Morgan County's failure to provide Spanish interpreters. (*Id.* at 45–46.)

On cross-examination, Settle testified that he has been filing habeas petitions since 2003 or 2006, and that form federal habeas petitions are available from the law library and from the federal court. (*Id.* at 48–49.) Settle first heard that Petitioner wanted to file a challenge to his conviction in 2009, and at that time Settle was the only inmate in the unit who was familiar with filing pro se pleadings in court. (*Id.* at 50.) To Settle's knowledge, before Petitioner met him, Petitioner had never attempted to file any kind of inquiry with the court or tried to get legal assistance or an interpreter. (*Id.* at 52.) Petitioner had concluded his state proceedings, "[b]ut when that stopped, he didn't know no further that he had – could bring it over here and file a

2254." (*Id.* at 53.) On re-direct, Settle testified that in order to obtain a blank federal habeas form petition from the library, he would have to submit a written request specifying the form he wanted, and that to his knowledge there were no Spanish speakers working in the library. (*Id.* at 54.)

Finally, Petitioner testified on his own behalf, through an interpreter. He grew up speaking Spanish in Puerto Rico, only completed the second or fifth grade in school, and came to the continental United States when he was 21. (Docket No. 110, at 56–57.) He testified to the effect that he had been provided with an interpreter during proceedings on a previous criminal charge, but did not have one during proceedings for the convictions he is currently challenging, and did not understand what was happening during the proceedings. (*Id.* at 59–61.) He did not receive any material in Spanish about his legal rights or filing federal court lawsuits in either the Marshall County Jail or in the Tennessee Department of Correction (TDOC) classification center. (*Id.* at 61–62.) After he was classified, Petitioner was moved to Northwest in July 2006. (*Id.* at 63.) As a close security inmate at Northwest, Petitioner did not have access to the library. (*Id.* at 63.) After saying that he did not have access to any Spanish-speaking staff at Northwest to help him with legal questions, the Petitioner testified:

Q. Did you try to find other inmates who could help you with your legal case?

A. I didn't know that I could appeal. I had no understanding that I had to appeal.

(*Id.* at 63.) For about two months at Northwest, Petitioner had a Spanish-speaking cellmate named Shannon Jones. (*Id.* at 64.) Petitioner gave Jones the paperwork he had about his case, and Jones wrote to Petitioner's lawyer and "did everything" regarding his case. (*Id.*) Petitioner testified that after Jones was moved, he did not have anyone with whom he could speak Spanish. (*Id.* at 64–65.) Petitioner submitted a request for an interpreter at Northwest once when he wanted someone to translate a letter he received from court, but the institution did not provide anyone to translate it for him. (*Id.* at 65.) Nothing else happened regarding his court

8

case while he was at Northwest. (*Id.* at 66.) Petitioner arrived at Morgan County in August 2009 as a maximum security inmate, which meant he was in his cell for 23 hours a day with one hour for recreation and no access to the library. (*Id.* at 66.) He was not provided with any information about his legal rights at Morgan County, and there were no Spanish-speaking inmate advisors there. (*Id.* at 66–67.) When Petitioner submitted requests, an English-only speaker would come to see him and he would have Delgado help translate for him by yelling through the air vent. (*Id.* at 67.) Petitioner explained that when he needed to communicate with an inmate advisor

> what I would do is I would come to an agreement with [Delgado] for him to do it and for him to explain what was going on. And so he would work it out for it to happen, and for that person to go to his cell. And then later he would explain to me how things worked.

(*Id.* at 67–68.) Delgado told Petitioner that Settle knew about filing claims in court, so Petitioner gave Settle his paperwork. (*Id.* at 68.) Before he met Settle, Petitioner did not know anything about his legal remedies:

> No, I didn't – I didn't know anything. Everything that they would give me was in English, and I didn't know that I had the right to appeal, I didn't know anything.

(*Id.* at 68.)

On cross-examination, Petitioner acknowledged that he speaks "some English," (*id.* at 69), but maintained that he did not understand what happened in state court, that he answered the judge's questions by either following the lead of the other defendants who were present at the same time or choosing randomly between "yes" and "no," (*id.* at 69–71, 76–79), and that he told the judge he understood when he didn't, because he just wanted to move the process forward. (*Id.* at 86.) He testified that fellow inmate Shannon Jones had done everything to prepare and file his 2007 application for permission to appeal to the Tennessee Supreme Court. (*Id.* at 72.) Petitioner said that counsel in his previous criminal case knew he did not speak English, so she got him an interpreter without his having to request one. (*Id.* at 75.) In the case at issue, Petitioner did not have an interpreter, but he did not testify that he ever requested one.

9

(*Id.* at 76.) He testified that at one point the judge sent him to the hallway to confer with counsel because he could not understand, and then "my attorney sent me back into court for me to get my sentence." (*Id.*) Petitioner testified that he did not understand the written plea petition,[4] and equivocated about having seen it despite his signature on it:

> Q: Was it that your attorney didn't read it to you? Or that he read it or she read it and you didn't understand it? Which is it?
>
> A: I never saw this document. Never.
>
> Q: You never saw the document, but you signed it?
>
> A: Yeah, I know it's my sign, but – well, that's my sign, yes, I signed it. But if I had known that there were going to be a sentence, there were going to be these multiple sentences, then I would not have accepted it. I wouldn't have accepted it.

(*Id.* at 81.) He testified that he believed that he was being sentenced to 20 years. (*Id.* at 82.) With regard to the record of his saying "I finished high school" when the judge at the plea hearing asked him how far he got in school, he testified that he did not think he would have said that and that the transcript was inaccurate. (*Id.* at 85.) When he told the judge that he could read and write, he meant that he could read and write in Spanish. (*Id.* at 86.)

On re-direct, Petitioner testified that after Shannon Jones filed his motion with the Tennessee Supreme Court, Jones was transferred to another facility. (*Id.* at 90–91.) The court later sent him a letter in English, which prompted him to submit the request[5] for assistance with translation about which he testified earlier, but no one helped him with his legal paperwork again

---

[4] Respondent's counsel referred to this document as a "plea agreement" (Docket No. 110, at 79), but it is an open plea petition without the prosecution's agreement. (Docket No. 27-1, at 87–88.)

[5] On re-direct, counsel used the term "grievance" to refer to this request, but Petitioner's direct testimony very clearly established that it was **not** a prison grievance:

> Q. That's what you wrote in your grievance request? Or request?
> A. Yes.
> Q. And was that a grievance form?
> A. No, it's just like a request for someone to come read my documents, translate them into Spanish.

(Docket No. 110, at 65.) There is nothing in this Court's record to suggest that Petitioner ever filed a grievance at Northwest about the failure to provide translation services.

until Mike Settle. (Docket No. 110, at 91.)

On re-cross examination, counsel for Respondent asked Petitioner whether he had ever made any efforts to get assistance from anyone to pursue his legal rights between his interactions with Jones and Settle, and Petitioner responded: "I have tried as hard as I could because everything they gave me was in English." (Docket No. 110, at 92.)

Respondent's only witness at the hearing was Donna Hargrove, Petitioner's appointed counsel on the charges that led to the convictions and sentences he challenges. She testified that it has become very common in her district to have clients for whom English is a second language, that she speaks very little Spanish and frequently uses interpreters in representing those clients, and that she does not recall ever having her request for an interpreter denied by the court. (Docket No. 110, at 97–99.) Hargrove testified that it is fairly easy during conversation with a client to determine whether an interpreter is needed, but that even if she has had no difficulty conversing with a client, if the client says – usually when they get to court – that he or she does not understand, she will bring it to the court's attention and get an interpreter. (*Id.* at 98–99.) Hargrove recalled being able to communicate with Petitioner in English despite his heavy accent, and that although she would not describe him as fluent, he could ask and answer questions in full sentences in a manner that reflected that he understood what she was saying. (*Id.* at 100, 101.) She testified that she did not believe that "he did not understand what was being said or that we ever needed an interpreter in any way." (*Id.* at 101.) According to Hargrove, there may have been times when Petitioner said he did not understand something she said, so she would explain further or rephrase, but Petitioner "never at any time said anything about needing an interpreter." (*Id.*) She did not specifically recall discussing Petitioner's plea petition with him, but her normal course would be to ask a client to read the document and to read it to them if there is any indication they cannot read it themselves. (*Id.* at 105.) The remainder of Hargrove's direct testimony was primarily concerned with the details of

the state's plea offer to Petitioner and how he came to enter an open plea.

On cross-examination, Hargrove testified that she remembered "a couple of specific discussions" with Petitioner, but not the specifics of those conversations. (*Id.* at 111–12.) Because she signed his plea petition, she would have been the one who reviewed the petition with him and would not have signed it without asking if he understood it and whether he had any questions, but did not recall the specifics of that conversation. (*Id.* at 122.) She said that Petitioner seemed distrustful and did not offer a lot of conversation, and that he refused to speak with her investigator or the probation officer preparing the presentence report at all. (*Id.* at 113.) She did not have a psychologist examine him or conduct any formal assessment of his ability to speak English. (*Id.* at 115–116.) Asked if it were possible that she was mistaken and that Petitioner did have problems understanding English, she responded "Anything is possible. . . . But we had conversations well enough . . . that we felt that he understood everything that we were saying and he could respond back to us other than just simple yes and no answers." (*Id.* at 121.) She testified that she never provided Petitioner with any documents about his case in Spanish. (*Id.* at 122.) Hargrove also testified about her recollection of Petitioner's plea hearing.

On re-direct, Hargrove said that based on her communications with Petitioner, she believed he could communicate adequately with English-speaking inmates and prison staff to pursue post-conviction relief if he were interested in that. (*Id.* at 122–23.) On re-cross, she testified that she knows that the defenders discussed with Petitioner his right to appeal his sentence despite his plea, that they actually did take a direct appeal in his case, and that their ordinary course after that would include advising him about his right to pursue post-conviction relief, as 90 percent of their clients do. (*Id.* at 123–24.) They do not, however, provide advice about federal habeas proceedings. (*Id.* at 125.) Hargrove testified that after filing Petitioner's direct appeal, she received a letter written in English from someone on his behalf asking why an appeal had been filed when a plea agreement had been entered, and she assumed it was

12

written by a jailhouse lawyer who did not know the details of Petitioner's open plea. (*Id.* at 124.) She did not take it to mean that Petitioner was confused about what happened in his case, because he knew that he got 30 years after the open plea rather than the 40 years – two consecutive 20-year sentences – that the prosecution had offered. (*Id.* at 125.)

III. ANALYSIS

The Antiterrorism and Effective Death Penalty Act (AEDPA) imposes a one-year limitations period for habeas petitions brought by prisoners challenging state-court convictions. 28 U.S.C. § 2244(d). Under this provision, the limitations period runs from the latest of four enumerated events:

(A) the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review;

(B) the date on which the impediment to filing an application created by State action in violation of the Constitution or laws of the United States is removed, if the applicant was prevented from filing by such State action;

(C) the date on which the constitutional right asserted was initially recognized by the Supreme Court, if the right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review; or

(D) the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence.

28 U.S.C. § 2244(d)(1). Although the running of the period is tolled under § 2244(d)(2) while any "properly filed" collateral review petition is pending in state court, Petitioner never filed such a petition in state court and acknowledges that his AEDPA limitations period expired in November 2008, one year after his conviction became final following direct appeal. (Docket No. 115, at 13.) His federal habeas petition filed on January 25, 2010, is therefore time-barred unless he can establish a basis for equitable tolling of the limitations period.

AEDPA's one-year statute of limitations may be subject to equitable tolling when the failure to file in a timely fashion "unavoidably arose from circumstances beyond that litigant's control." *Keeling v. Warden, Lebanon Corr. Inst.*, 673 F.3d 452, 461 (6th Cir. 2012); *accord Holland v. Florida*, 460 U.S. 631, 645 (2010). To be entitled to equitable tolling, a petitioner

13

must show: "(1) that he has been pursuing his rights diligently, and (2) that some extraordinary circumstance stood in his way and prevented timely filing." *Lawrence v. Florida*, 549 U.S. 327, 336 (2007) (citation and internal quotation marks omitted). This is a fact-intensive inquiry to be evaluated on a case-by-case basis, and Petitioner carries "the ultimate burden of persuading the court that he or she is entitled to equitable tolling." *Keeling*, 673 F.3d at 462.

In *Cobas v. Burgess*, the Sixth Circuit held that an untimely habeas petitioner's being raised in Cuba and "unable to understand, read or write the English language" did not automatically entitle him to equitable tolling. 306 F.3d 441 (6th Cir. 2002). The court affirmed dismissal of Cobas's petition as untimely because the record demonstrated that Cobas "was clearly able to communicate with the person who helped him" to write a detailed letter to his attorney and to file two state post-conviction motions. *Id.* at 444. It announced the following guideline to be applied to equitable tolling claims by non-English-speaking petitioners:

> We hold that where a petitioner's alleged lack of proficiency in English has not prevented the petitioner from accessing the courts, that lack of proficiency is insufficient to justify an equitable tolling of the statute of limitations. An inability to speak, write and/or understand English, in and of itself, does not automatically give a petitioner reasonable cause for failing to know about the legal requirements for filing his claims.
>
> In general, the existence of a translator who can read and write English and who assists a petitioner during his appellate proceedings implies that a petitioner will not have reasonable cause for "remaining ignorant of the legal requirement for filing his claim." In announcing this rule, we should note that the translator acting on behalf of a non-English speaking petitioner need have no qualification other than the ability to communicate in English. Since a petitioner does not have a right to assistance of counsel on a habeas appeal, and because an inmate's lack of legal training, his poor education, or even his illiteracy does not give a court reason to toll the statute of limitations, we are loath to impose any standards of competency on the English language translator utilized by the non-English speaking habeas petitioner.

*Id.* at 444 (internal citations omitted). *Cobas* has been construed to mean that "a non-English-speaking petitioner seeking equitable tolling must, at a minimum, demonstrate that during the running of the AEDPA time limitation, he was unable, despite diligent efforts, to procure either legal materials in his own language or translation assistance from an inmate, library personnel

14

or other source." *Mendoza v. Carey*, 449F.3d 1065, 1070 (9th Cir. 2006). Accordingly, an inmate creates a genuine issue of material fact regarding his entitlement to equitable tolling when he presents corroborated testimony that "he is wholly incapable of reading, writing, or speaking English, had no access to Spanish language legal materials, and attempted on numerous occasions to obtain assistance in pursuing his claims." *Planes v. Berghuis*, No. 07-cv-14000, 2009 WL 2382006, at *5 (E.D. Mich. July 31, 2009).

To determine whether Petitioner's alleged inability to communicate in English "stood in his way and prevented timely filing" and "prevented the petitioner from accessing the courts" under *Lawrence* and *Cobas*, the Court looks at his circumstances during the period in which his petition would have been timely: November 2007 to November 2008. Petitioner was at Northwestern throughout that time. Much of the evidence he has presented on paper (see Docket No. 54-1, at 4–5; Docket Nos. 54-2 – 54-3) and at the evidentiary hearing concerns his persistent efforts to obtain interpreter services at Morgan County, but by the time Petitioner arrived there in August 2009, any federal habeas petition was already long overdue. Neither the alleged obstacles to his accessing the court while at Morgan County nor his diligence in challenging those obstacles, therefore, played any role in his failure to file a timely habeas petition before he arrived there. Likewise, any alleged obstacles he encountered in the Marshall County Jail or the TDOC classification center in 2005 and 2006 had nothing to do with his failure to file a federal habeas petition that could not have been adjudicated until the conclusion of his direct appeal in 2007 at the earliest.

Focusing on the relevant period when Petitioner was at Northwest, it is undisputed that Petitioner did not have direct access to the library, but that is a circumstance shared by every close custody inmate in the institution and is not the type of "extraordinary circumstance" required to warrant application of equitable tolling. Petitioner's presentation also emphasized the fact that the prisons did not proactively distribute or post information to educate inmates

15

about their legal remedies, but that omission impacted every inmate in the system equally, because the information was not distributed in *any* language. Rather, it is up to each inmate to seek out the information he needs, and the inmate testimony at the hearing established that inmates who are not permitted to visit the library may still access legal materials by submitting written requests for particular materials or for a visit from a library staff member or inmate advisor who can provide information about available legal resources.

Petitioner has established that the available materials were not in Spanish and that the library staff and inmate advisors only spoke English. But the proof also demonstrates that he had the ability to overcome that impediment by having other Spanish-speaking inmates assist him, including helping him fill out written requests or translating for him with staff or more knowledgeable inmates, as Sanchez and Delgado did. It is notable that Petitioner, Delgado and Settle were all three on maximum security while they managed to communicate effectively enough to file a habeas petition, a civil lawsuit and several grievances. While he was at Northwest, Petitioner was able to get assistance from his bilingual cellmate Jones to file his application to appeal to the state supreme court. His claim that after Jones transferred he did not have anyone else who could speak Spanish seems dubious and was refuted by Sanchez, who testified that there were "a lot" of Spanish-speaking inmates and "like two" Spanish-speaking officers at Northwest. Yet the only evidence in the record that Petitioner made any affirmative effort to seek assistance from anyone after Jones left is his own testimony that he submitted a single request to have someone translate a letter he received from a court in English. When the facility did not comply with the request, Petitioner apparently did nothing to follow up. There is no suggestion in the record that while Petitioner was at Northwest he submitted any additional written requests, submitted any institutional grievances, ever verbally asked for an interpreter or to speak to one of the Spanish-speaking officers, or even sought the assistance of another inmate. Neither Sanchez nor Delgado knew of any such efforts on

Petitioner's part, and Settle testified that to his knowledge Petitioner had not made any effort to access the court since concluding his direct appeal until they met. Petitioner's vague testimony that between his involvements with Jones and Settle he "tried as hard as [he] could" to get help asserting his legal rights is not supported by any detail or corroboration in the record and does not merit any weight in the Court's analysis. Petitioner has not established that he made "diligent efforts" or "attempted on numerous occasions" to obtain the assistance he needed during his AEDPA limitations period, as required to justify equitable tolling under *Cobas*. *Mendoza*, 449 F.3d at 1070; *Planes*, 2009 WL 2382006, at *5.

Moreover, the intimation that Petitioner was diligently attempting to pursue his legal remedies during the relevant time period is belied by more credible evidence in the record to the effect that Petitioner was simply unaware at that time that he had any legal remedies to pursue. Settle testified that Petitioner did not know that "he needed to take the matter on to the federal court" or that "he had – could bring it over here and file a 2254." Petitioner's testimony confirmed Settle's understanding. Asked by his attorney whether he tried to find other inmates at Northwest to help with his legal case, Petitioner did not say yes or describe any efforts to do so; he said that he "didn't know that [he] could appeal." Asked later whether he knew before meeting Settle what his legal rights were, he said "No, I didn't – I didn't know anything."[6] Similarly, in his *pro se* response to Respondent's motion to dismiss as untimely, which the Court denied without prejudice and never considered, Petitioner affirmatively asserted that the statute of limitations did not apply "because he had no actual knowledge of § 2254 until 2010." (Docket No. 26, at 3.) But a prisoner's lack of actual knowledge about available legal remedies or the time limits for pursuing them is not a sufficient basis for equitable tolling. *Allen v. Yukins*, 366

---

[6] Petitioner blamed that ignorance on his contention that "[e]verything that they would give me was in English," but the only document he even claims that he tried to get translated at Northwest was presumably the state supreme court's denial of the application for permission to appeal that Jones had submitted for him. Regardless of his ability to read it, that document would not have provided him with any information about his right to file a federal habeas petition or his deadline for doing so. (Docket No. 2, at 18.)

17

F.3d 396, 403 (6th Cir. 2004) (lack of actual knowledge of § 2244 deadline insufficient to toll); *Reed v. United States*, 13 F. App'x 311, 313 (6th Cir. 2001) (holding that "ignorance about filing a § 2255 motion did not toll the limitations period"); *Clinton v. Bauman*, No. 10-11528, 2011 WL 282384 (E.D. Mich. Jan. 25, 2011) (ignorance of state post-conviction remedies did not warrant tolling); *Williams v. Warden of Lieber Corr. Inst.*, No. 0:12-1705, 2013 WL 1857268 (D.S.C. May 2, 2013) (petitioner's unawareness that he could file a federal habeas petition not grounds for equitable tolling).

Had Petitioner known of his ability to pursue relief, a language barrier would not have presented him from doing so at Northwest. The record developed at the evidentiary hearing establishes that Petitioner had access to potential translators with the ability to assist him with his legal proceedings to the extent required by *Cobas*. At the hearing and in his briefs, Petitioner points out that many of the Spanish-speaking inmates to whom he had access had no legal training or knowledge. But *Cobas* expressly disavows any requirement that the person translating for a petitioner have any "qualification other than the ability to communicate in English" or meet any other "standards of competency." *Cobas*, 306 F.3d at 444. All Petitioner needed was to have someone translate or act as go-between with the English-speaking library staff and explain the library materials to him in order to have the same information to which any other inmates had access. The credible evidence establishes that there were inmates at Northwest who could have served that function, just as Delgado did at Morgan County, and that there were also correctional officers who might have translated for him upon request. Petitioner's claim to have submitted a solitary request for interpreting service about which he never followed up or submitted a single grievance at Northwest certainly fails to prove otherwise, and the burden is on Petitioner to prove both the obstacle and his diligence in trying to overcome it.

Because the Court finds that Petitioner did not make any timely effort to pursue habeas

relief that was thwarted by a language barrier, it is not necessary for the Court to resolve the extensive conflicting evidence in the record about the true extent of that barrier. The Court therefore respectfully rejects the Magistrate Judge's conclusions about the merits of Petitioner's underlying ineffective-assistance and involuntary plea claims. The Court's instruction was to "receive evidence and/or hold an evidentiary hearing on the question of whether the statute of limitations should be equitably tolled" (Docket No. 56), the Magistrate Judge entered an order stating that the "hearing is required both to resolve the question of whether the statute of limitations should be equitably tolled and to address the issue of procedural default" (Docket No. 97), and the clear understanding of Petitioner's counsel at the hearing was that the "hearing [was] directed at that, at the equitable tolling and procedural default issues, not the subject of the underlying pleas." (Docket No. 110, at 83; see also *id.* at 94–95.) It would be inappropriate to rule on the merits of the petition under those circumstances. Moreover, such a ruling would not dispose of Petitioner's first two *pro se* claims (Docket No. 2, at 3–6), which were not developed at all in the hearing.

The Magistrate Judge's conclusion that Petitioner is not entitled to equitable tolling is nevertheless correct, and that finding and the recommendation to dismiss the case on that basis will be adopted and approved.

An appropriate Order shall enter.

*Kevin H. Sharp*

Kevin H. Sharp, Chief Judge
United States District Court